UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WHO DAT YAT CHAT, LLC                    CIVIL ACTION

VERSUS                                   NO: 10-1333
                                         c/w 10-2296

WHO DAT, INC.                            SECTION: J (4)


**ORDER AND REASONS**

Before the Court are motions for summary judgment filed by

Who Dat Yat Chat, LLC (Rec. Doc. 166), Storyville Apparel LLC

(Rec. Doc. 184), and Fleurty Girl, LLC (Rec. Doc. 194); Who Dat,

Inc.'s oppositions to same (Rec. Docs. 205, 207, and 206);

replies (Rec. Docs. 217, 215, and 221); and a sur-reply (Rec.

Doc. 224). Having considered the motions, the legal memoranda,

the record, and the applicable law, the Court is prepared to rule

on the motions.


**FACTUAL AND PROCEDURAL BACKGROUND**

The instant lawsuit primarily concerns the claim of

trademark rights in the phrase "Who Dat." The phrase is in

popular usage in Louisiana as an expression of community pride,

sports enthusiasm, and other notions of social significance. The

subject of this lawsuit is well-known. In early 2010, in

conjunction with New Orleans Saints Superbowl mania, sales of

1

merchandise with the phrase "Who Dat" exploded in Louisiana. Big business took notice. The NFL sent cease-and-desist letters to local retailers, although it eventually backed off its position. However, the NFL has settled, leaving the case in a somewhat uncertain procedural posture that merits a brief review before turning to the merits.

## A. Procedural History

This proceeding includes two consolidated cases. The first is a declaratory judgment action filed by Who Dat Yat Chat, LLC ("WDYC") in 2010, which was removed to the Eastern District of Louisiana. At the time, WDYC intended to open a coffee shop in Violet, Louisiana, bearing the name "Who Dat Yat Chat." WDYC received a cease-and-desist letter from Who Dat, Inc. ("WDI"), advising that WDYC's plan to open the coffee shop bearing the intended nomenclature would violate WDI's trademark rights in the phrase "Who Dat." Also during March 2010, WDI filed its own lawsuit in the Middle District of Louisiana alleging trademark infringement and naming several defendants, including the NFL, the New Orleans Saints, the Louisiana Secretary of State, and several Louisiana retailers. In the complaint, WDI alleged its entitlement to declaratory relief; cancellation of Saints trademarks; a permanent injunction; and damages for fraudulent registration, breach of contract, deceptive advertising, unfair competition, trademark infringement, trademark dilution,

commercial and product disparagement, negligence, and fraud.

On June 2, 2010, the Court denied WDYC's motion to remand and granted WDI's motion to transfer the declaratory judgment action to the Middle District, where WDI's lawsuit was then pending (Rec. Doc. 20). Thereafter, WDI's lawsuit involving the NFL was transferred to the Eastern District, leaving the WDYC declaratory judgment action the only lawsuit pending in the Middle District related to the Who Dat trademark claims (Rec. Doc. 24-4). On September 17, 2010, Judge James Brady in the Middle District ordered, in light of the parties' joint advisory, that the declaratory judgment action be transferred back to the Eastern District (Rec. Doc. 24). Several days later, the Court ordered WDI's lawsuit and the WDYC declaratory judgment lawsuit consolidated (Rec. Doc. 26). In October 2010, the Court recognized the "somewhat unusual procedural posture" for the WDYC lawsuit in denying WDYC's motion for sanctions against WDI (Rec. Doc. 46).

On November 17, 2010, the Court ruled on a motion to dismiss filed by the NFL and the New Orleans Saints concerning claims brought against them by WDI (Rec. Doc. 64).[1] On January 4, 2011, the Court denied WDI's motions to dismiss Fleurty Girl, LLC's

---

[1] The Court granted the motion as to issues of negligent and fraudulent misrepresentation and federal disparagement and denied the motion on the issues of breach of contract and the application of a Louisiana cancellation statute. Rec. Doc. 64, at 22. The defendants who filed that motion have since settled with WDI and are no longer in this lawsuit.

("Fleurty Girl") and Storyville Apparel LLC's ("Storyville")
counterclaims and WDYC's claims (except WDYC's claim for treble
damages under the Louisiana Unfair Trade Practices Act, which the
Court dismissed) (Rec. Doc. 76). After rulings by the Magistrate
Judge on several motions to compel, motions for sanctions, and
motions for attorney's fees, the NFL, the Saints, and WDI settled
all claims in this lawsuit amongst themselves (Rec. Doc. 187).
Subsequently, WDYC, Storyville, and Fleurty Girl all filed
motions for summary judgment and/or partial summary judgment to
dismiss WDI's counterclaims and claims against them (Rec. Docs.
166, 184, and 194). Those motions are set for hearing on the
briefs on February 29, 2012 (Rec. Doc. 204).

**B.  Background Facts**

During oral argument on a prior motion to dismiss, the
lawyer for the Saints and the NFL stated that it was the Saints'
position that "Who Dat" is a "generic phrase" in the "public
domain," although the Saints would still protect the phrase as a
trademark when used in connection with other NFL or Saints
trademarks. Rec. Doc. 61, at 16. The Saints' and NFL's lawyer
proceeded to relate to the Court that a "black and gold t-shirt
saying *Who Dat*" was "fair game" and that if WDYC's owner wanted
to "put that Who Dat on her coffee shop, God bless her." Id.
Although this conciliatory statement was followed up with the
NFL's and the Saints' choice to bow out of the suit via a

4

complete settlement with WDI and the voluntary dismissal of all claims levied by these parties against each other (Rec. Doc. 187), WDI makes no concession of its trademark claims against local retailers Fleurty Girl and Storyville and its counterclaims against WDYC.

According to its complaint, WDI is a Louisiana corporation formed in 1983, owned by brothers Sal and Steve Monistere. In that same year, Steve Monistere and Carol Nuccio wrote, produced, and recorded "Who Dat" as a song, with Aaron Neville and a few New Orleans Saints football players singing along. That same month, WDI recorded state trademark registrations for the phrase "Who Dat." WDI avers that in 1988, at the request of the New Orleans Saints, WDI helped form and promote the Who Dat! Fan Club, that the Saints recognized WDI as the first user of the "Who Dat" mark, and that the Saints contractually agreed to transfer any trademark rights it had in the phrase "Who Dat" to WDI. WDI claims ownership of the mark "Who Dat" and claims that it has derived income from royalty payments and licensing fees from the sale of merchandise bearing "Who Dat" trademarks.

WDI alleges that "Steve Monistere decided to develop a phrase that could be used as a battle cry unique to fans of the Saints" (Rec. Doc. 41, at 8). WDI's allegation is juxtaposed

against the movants' and their proposed expert's[2] conclusion that it is beyond dispute and well-known that the phrase was in widespread use long before the 1980s—in African-American minstrel shows, high school football games, and everyday speech. In any case, WDI asserts through the affidavits of Steve and Sal Monistere that the brothers promoted the Who Dat! Fan Club through personally handing out flash cards and selling t-shirts, bumper stickers, and other merchandise bearing WDI's Who Dat trademarks. WDI avers that it has consistently and continuously used its Who Dat marks by distributing, selling, manufacturing, licensing, and offering products, goods, services, entertainment, music CDs, records, albums, food, and merchandise under the marks from 1983 until the present.

As previously noted, WDI has pending claims against WDYC, Fleurty Girl, and Storyville, which claims are the object of the instant summary judgment motions. As previously discussed, WDYC is the name of a coffee shop that WDYC's owner has intended to open in Violet, Louisiana. Fleurty Girl is a local New Orleans retailer that sells t-shirts, children's books, jewelry, and other accessories. Fleurty Girl's merchandise contains the phrase "Who Dat" as well as variations on that phrase. Storyville is also a retailer that offers various products

---

[2] The movants submit the report of Shana Walton, a professor of languages and literature at Nicholls State University. The parties dispute the report's admissibility; WDI requests that it be stricken.

containing the phrase "Who Dat."  One of the movants is quick to
point out that the extent of WDI's licensing scheme has not been
limited to small retailers, citing WDI's cease-and-desist letter
to Coca-Cola.  Rec. Doc. 194-1, at 3 (citing Rec. Doc. 194-2, at
16).  There also claims pending against Monogram Express and
Liquid Ventures Inc., who were both defaulted on March 15, 2011.
Rec. Doc. 100.[3]  Logo Express Marketing, Inc. settled with WDI in
December 2011 (Rec. Doc. 163).

The third amended complaint filed by WDI presents 13 counts
(Rec. Doc. 41).  These counts request declaratory relief; request
cancellation of certain marks; allege fraudulent registration of
certain marks; request a permanent injunction; and allege claims
for breach of contract, deceptive advertising under Louisiana
law, trademark infringement under the Lanham Act, state statutory
trademark infringement and dilution, unfair competition, federal
trademark dilution, federal commercial and product disparagement,
negligence, and fraud.  The issue is whether WDI's claims and
counterclaims against WDYC, Fleurty Girl, and Storyville survive
summary judgment.  WDYC seeks dismissal of all claims asserted by
WDI in its complaint and cancellation of WDI's trademark.
Fleurty Girl and Storyville each moves for dismissal of all of
WDI's claims against it.

---

[3] The Court noted that Monogram Express is represented by its sole
proprietor, Keith Moody.  Rec. Doc. 102.  The Court invited Mr. Moody to move
to set aside the default.  Id.  To date, he has not done so.

## THE PARTIES ARGUMENTS

The three movants largely advance the same arguments for dismissal of WDI's claims against them. The overarching theme depicted in the several motions is that the phrase "Who Dat" is in the "public domain" and therefore insusceptible of being trademarked. The movants assert that the phrase was never associated with any specific good or service, and was never limited to any particular sport or sports team. Rather, the phrase was in the public domain long before WDI purported to adopt it as a trademark. In similar fashion, they argue that WDI has no goodwill in "Who Dat" because WDI's initial use was to record a song to associate the phrase with the Saints football team, rather than to identify the source of any products WDI intended to sell. They argue that when consumers buy "Who Dat"-labeled goods, they do not contemplate a single source backing the quality of the goods. The movants' argument is well-encapsulated by Fleurty Girl's characterization of WDI's stance: common phrases in the public domain are automatically trademarkable if one simultaneously forms a company with the same name.

The retailer movants argue that "Who Dat" is generic because it describes a type of good—t-shirts (and other apparel) that say "Who Dat"—and therefore is not a protectable trademark. To illustrate, Storyville states that consumers walk into the

movants' stores asking for a "Who Dat t-shirt."  Therefore, the
phrase "Who Dat" is generic because it describes a particular
class of products.  The movants argue, in the alternative, that
"Who Dat" is merely descriptive of t-shirts that say "Who Dat,"
the phrase has not acquired secondary meaning, and therefore it
is not trademarkable.  In support of their secondary meaning
argument, the movants argue that WDI cannot show that the term's
primary significance in the public's mind is the producer, rather
than the product.  They aver that if a survey were taken, it
would prove what is already known—that WDI is not associated in
the public mind with "Who Dat."

WDI responds that the movants' "public domain" analysis is
misguided.  As an initial matter, WDI asserts that most
trademarks are words, phrases, or symbols that come from the
public domain, as in "Apple" for computers and "Nike" for
sporting goods.  It avers that the appropriate analysis is
whether "Who Dat," when used in connection with the sale of
specific goods and services, is sufficiently distinctive to
warrant protection.  WDI states that it does not seek to exclude
fans of the New Orleans Saints from using the phrase as a battle
cry at football games, but rather to claim exclusive rights to
the mark in connection with the sale of goods and services
similar to those provided by WDI in connection with the Who Dat

marks.[4]

WDI argues that its mark is strong and protectable.  It argues that the genericism argument is extremely misguided.  To illustrate, it states that if "Who Dat" was a generic trademark, a customer would walk into a store and request "a Who Dat" because the mark would identify the class of goods to which the product belongs.  This is not the case; "Who Dat" is not generic for "t-shirt."  WDI also avers that the mark is not merely descriptive because "Who Dat" does not describe any aspect of the goods or services bearing that phrase.  Rather, WDI asserts, "Who Dat" is an arbitrary mark, entitled to the strongest possible protection, in that it is a phrase with common words used in a unique way to identify the source of WDI's trademarked goods. Additionally, the United States Patent and Trademark Office's ("PTO") registration of WDI's Who Dat marks, in the context of soft drinks, entertainment services, fishing lures, and clothing, is prima facie proof of the mark's distinctiveness.  WDI further argues that, in any case, the proper categorization of a mark's strength is a question of fact and that the public need not be able to identify the actual source of a trademarked good for the trademark to serve as a source indicator for that good.

Specifically in response to WDYC's motion, WDI avers that

---

[4] The Court's use herein of the phrase "Who Dat mark(s)" is not in any way intended to acknowledge actual trademark protection, but rather refers to WDI's *putative* trademark(s) in the phrase "Who Dat."

its "Who Dat Blues Band" mark is valid, protectable, and incontestable. It argues that the registration of this mark by the PTO is prima facie proof of the mark's distinctiveness. It avers that the repeated granting of registration for its Who Dat marks by the PTO in various contexts shows that the Who Dat marks are inherently distinctive, without the need for any proof of secondary meaning.

The movants also argue that WDI's state trademark registrations are ineffective in conferring any trademark rights to WDI. Although acknowledging that state registration may confer procedural advantages, the movants argue that the state registrations at issue did not create any substantive rights. They assert that WDI's state registrations have expired or were canceled. WDYC argues that state registration was improperly granted because WDI has not made or sold any goods bearing its alleged trademarks. It also argues that WDI's state registration was obtained fraudulently. WDI responds that a trademark need not be registered for it to obtain protection because trademark ownership is established by use, not registration. It also states that it need not rely on its state registrations because its federal trademark rights are sufficient for its claims to survive summary judgment.

WDYC argues that WDI's incorporation including the term "Who Dat" does not allow WDI to prevent WDYC from opening a coffee

shop entitled "Who Dat Yat Chat." It asserts that a corporation
does not have the right to use a corporate name if such use would
amount to unfair competition in the use of a mark. It argues
that WDI has gained no trademark rights by incorporating as "Who
Dat, Inc."

WDYC also argues that collateral estoppel precludes WDI from
litigating its claims in this case. WDYC argues that a state
court ruled on the instant claims when WDI previously filed for a
preliminary injunction. WDI responds that the prior state court
judgment dismissed a request for a temporary restraining order
and both parties' request for a preliminary injunction. WDI
argues that none of the issues raised in the 1983 litigation were
litigated to the point of a final judgment.

Storyville argues that the phrase "Who Dat" on apparel is
functional, and therefore cannot be a trademark. It states that
consumers demand t-shirts with the phrase "Who Dat" because of
their desire to express group identity and to show support for
the region and for the Saints football team. Storyville argues
that consumers purchase Who Dat t-shirts because of the words
themselves, not because the phrase indicates the source or
affiliation of the shirts. Therefore, "Who Dat" serves a
function that is essential to the underlying good on which it is
emblazoned. Fleurty Girl lends support to this argument in
stating that the consuming public does not care where the shirts

come from, and that "Who Dat" is not found on the inside label but rather the exterior that displays the message that a buyer seeks in purchasing a Who Dat shirt.

Storyville argues that WDI did not have a trademark in 2010, the year in which WDI sued Storyville, because WDI abandoned any trademark rights it may have had. Storyville avers that Storyville's business did not exist until 2006, and thus the only claims logically applicable to it are those for selling Who Dat-branded merchandise in late 2009 and early 2010, during the Saints Superbowl frenzy. Storyville argues that WDI dropped out of business for well over five years, failed to police its trademark for almost all of the 1990s and 2000s, and therefore abandoned any trademark rights it previously may have had. Storyville avers that although WDI filed an intent-to-use application in 1993, WDI never filed a statement of use, and in 1995, the PTO declared WDI's application abandoned. Storyville characterizes WDI's efforts as an intent to hoard a mark, rather than to use it in commerce. Storyville also asserts that the Saints, not WDI, registered "Who Dat" in 1988 for advertising and business, renewed the registration in 2008, and registered the phrase for clothing in 2007.

Storyville also argues that WDI's federal dilution claim should be dismissed because WDI cannot meet the high standard of proof of the mark's fame. Storyville asserts that it does not

bear the burden of proving lack of fame, but that WDI must prove
fame as one of the elements of its federal dilution claim.
Storyville argues that WDI has not met its summary judgment
burden, where the vast majority of the United States population
is unexposed to WDI's marks. Storyville also argues that each of
the 13 counts in WDI's third amended complaint must be dismissed
because they fail as a matter of law when applied to Storyville.

WDI argues that Storyville's arguments lack merit. WDI
cites case law that it asserts precludes Storyville's
functionality argument. Regarding Storyville's abandonment
argument, WDI asserts that there are issues of material fact
precluding a grant of summary judgment. WDI argues that its
inadvertent failure to file a statement of use does not indicate
an abandonment of actual use, and that the affidavits submitted
by WDI show that WDI continuously promoted and sold Who Dat
merchandise under its mark from 1983 to the present. As to the
dilution claims, WDI avers that the Louisiana statute does not
require a showing of fame; and as to the federal claim,
Storyville has provided no evidence regarding fame or lack
thereof. WDI avers that at least there are factual issues, where
the marks have been used for nearly 30 years, WDI has extensively
advertised using the marks, and WDI has applied for trademark
registration. Finally, although WDI concedes that certain causes
of action were asserted only against the New Orleans Saints and

the NFL, WDI argues that the other counts in the complaint
survive summary judgment.


**DISCUSSION**

**A.  Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, the
discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law." FED. R. CIV. P.
56(c)(2); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);
Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).
When assessing whether a dispute as to any material fact exists,
the Court considers "all of the evidence in the record but refrains
from making credibility determinations or weighing the evidence."
Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d
395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in
favor of the nonmoving party, but a party cannot defeat summary
judgment with conclusory allegations or unsubstantiated assertions.
Little, 37 F.3d at 1075. A court ultimately must be satisfied that
"a reasonable jury could not return a verdict for the nonmoving
party."  Delta, 530 F.3d 399.

If the dispositive issue is one on which the moving party will
bear the burden of proof at trial, the moving party "must come
forward with evidence which would 'entitle it to a directed verdict

if the evidence went uncontroverted at trial.'" Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1263-64 (5th Cir. 1991) (citation omitted).  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."  Id. at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.  See Celotex, 477 U.S. at 325.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  See id. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.  See, e.g., id. at 325; Little, 37 F.3d at 1075.

## B.  Federal Trademark Infringement Claims

Trademark law is concerned with the promotion of competition through protecting consumers against confusion and monopoly and protecting the investment of producers in their trade names.  Union Nat. Bank of Tex., Laredo, Tex. v. Union Nat. Bank of Tex., Austin, Tex., 909 F.2d 839, 843-44 (5th Cir. 1990).  A trademark is defined

16

by the Lanham Act as any word, name, symbol, device, or combination thereof used by a person in commerce to identify and distinguish his or her goods from those manufactured or sold by others and to indicate the source of the goods. 15 U.S.C. § 1127. The Fifth Circuit in <u>Union Nat. Bank of Tex., Laredo, Tex.</u>, 909 F.2d at 844, set forth the substantive requirements of a federal trademark infringement claim. First, the mark at issue must be protectable. <u>Id.</u> Under the Lanham Act, federal registration with the PTO constitutes prima facie evidence of the mark's validity, its registration, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in commerce or in connection with the goods specified in the registration. 15 U.S.C. § 1115(a). Second, the claimant must be the senior user of the mark at issue. <u>Union Nat. Bank of Tex., Laredo, Tex.</u>, 909 F.2d at 844. Third, the claimant must show a likelihood of confusion between his mark and the defendant's mark. <u>Id.</u> There must be a likelihood that potential consumers will confuse the source, affiliation, or sponsorship of the defendant's product with the plaintiff. <u>Elvis Presley Enter., Inc. v. Capece</u>, 141 F.3d 188, 193 (5th Cir. 1998).[5] In the case at bar, the movants focus only on

---

[5] To determine whether such a likelihood, or probability, exists, the court must consider the nonexhaustive "digits of confusion": (1) the type of trademark; (2) the similarity of marks; (3) the similarity of products; (4) outlet and purchaser identity; (5) advertising media identity; (6) the defendant's intent; (7) any evidence of actual confusion; and (8) the degree of care exercised by potential purchasers. <u>Xtreme Lashes, LLC v. Xtended Beauty, Inc.</u>, 576 F.3d 221, 227 (5th Cir. 2009); <u>Bd. of Supervisors for La. State Univ. Agric. and Mech. Coll. v. Smack Apparel Co.</u>, 550 F.3d 465, 478

the first element, arguing that because there is no genuine dispute that WDI does not have any protectable mark in the phrase "Who Dat," WDI's federal trademark infringement claim under the Lanham Act fails as a matter of law.[6]

### 1. Protectability

"Public domain" is the movants' rallying cry. Largely based on Ms. Walton's purported expert report setting forth the multi-century history of Who Dat's usage in common parlance and various cultural settings, the movants argue that because the phrase has always been in the public domain, it is not subject to exclusive use in commerce by any one entity. As WDI persuasively notes in its opposition memoranda, one need look no further than some of the most popularized brands in the United States to see that words and phrases eventually obtaining trademark protection often emerge from the sea of general human discourse—from "Apple" for computers to "Blackberry" for mobile phone devices. Indeed, the Fifth Circuit

---

(5th Cir. 2008), <u>cert.</u> <u>denied</u>, 129 S. Ct. 2759 (2009). Although the required showing is a probability, not a mere possibility, of confusion, <u>Westchester Media v. PRL USA Holdings, Inc.</u>, 214 F.3d 658, 664 (5th Cir. 2000), "a finding of a likelihood of confusion need not be supported by a majority of the factors." <u>Smack Apparel</u>, 550 F.3d at 478.

[6] The movants do advance some arguments that may functionally equate to an argument that WDI cannot demonstrate a likelihood of confusion. For example, Fleurty Girl asserts that "Who Dat" has never been associated in the public mind with a single source of goods or services. Rec. Doc. 194-1, at 1. It further asserts that the public in no way associates "Who Dat" with WDI. <u>Id.</u> at 5. However, the movants' memoranda do not explicitly attempt a likelihood-of-confusion analysis, and even if they did, that eight-factor test is a highly fact-specific inquiry. WDYC has a paragraph in its memorandum that merely recites the eight-factor test without any analysis. Rec. Doc. 217, at 5.

has favorably countenanced the selection of words and designs from the public domain to serve as trademarks:

> An individual selects a word or design that might otherwise be in the public domain to represent his business or product. If that word or design comes to symbolize his product or business in the public mind, the individual acquires a property right in the mark. The acquisition of such a right through use represents the passage of a word or design out of the public domain into the protective ambits of trademark law. Under the provisions of the Lanham Act, the owner of a mark acquires a protectable property interest in his mark through registration and use.

Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d 1004, 1014 (5th Cir. 1975), cert. denied, 423 U.S. 868 (1975). Although technically "Who Dat" cannot be trademarked if it is in the "public domain," this provides no real rule for decision. As the Fifth Circuit noted, the question is whether the mark comes to symbolize a product or business in the public mind. Id.

WDI argues that the Court should defer to the PTO's determination that the Who Dat marks are distinctive. It avers that the PTO has repeatedly granted registration of "Who Dat" as a mark in connection with a broad range of goods and services. WDI refers to patent applications and registrations in the context of soft drinks, live performances by a musical band, fishing lures, and apparel. However, because the counterclaim and claims at issue involve clothing retailers and a coffee shop, only the PTO filing regarding apparel appears relevant. WDI avers that it filed an application with the PTO to register the Who Dat mark in connection

19

with clothing, and that the application was approved for registration on June 2, 1992, without any demonstration of secondary meaning. However, the document cited by WDI actually indicates that the trademark application's "Abandonment Date" was February 26, 1993, and that the mark was not actually registered on June 2, 1992, but was "Published for Opposition" on that date. Rec. Doc. 206-9, at 1. Therefore, WDI cannot rely on its filing to establish ownership in a putative Who Dat mark for selling apparel.

Even so, this does not preclude the possibility that WDI has ownership of a trademark in "Who Dat" in the context of apparel and/or restaurants. Trademark ownership is established by use, not registration. Union Nat. Bank of Texas, Laredo, Tex., 909 F.2d at 842. A mark is deemed to be in use in commerce when either (1) it is placed in any manner on goods or their containers and the goods are sold or transported in commerce, or (2) for services, the mark is used or displayed in the sale or advertising of services and the services are rendered in commerce. 15 U.S.C. § 1127.

Fleurty Girl asserts that WDI appears never to have sold any of its own merchandise labeled "Who Dat" so as to identify its own goods, although WDI has persisted in licensing its putative trademark rights in the phrase to other businesses that do sell apparel labeled with the phrase. A trademark right cannot exist in a vacuum; it only arises in connection with specific goods or services. Cf. Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135,

1142 (9th Cir. 2002) ("We therefore adjudge a mark's strength 'by reference to the goods or services that it identifies,' and 'as it appears in the marketplace.'") (citation omitted). Further, the language of the Lanham Act states that the putative mark owner must use the mark to distinguish *his own* goods and services. See 15 U.S.C. § 1127 (defining a "trademark" to include a word used by a person to identify and distinguish "his or her goods" from those manufactured or sold by others). While it does appear that WDI currently, and perhaps historically, has licensed trademark rights to others who sell goods, WDI has submitted evidence that it has sold its own merchandise bearing the Who Dat marks. Steve Monistere, one of WDI's founders and its president, avers that around the time of filing an application with the PTO in 1988, he and other WDI employees sold "t-shirts, bumper stickers, and other merchandize" with WDI's Who Dat marks at Saints games. Rec. Doc. 207-1, at 4-5. A similar declaration has been made by Salvador Monistere, vice president of WDI. Rec. Doc. 207-12, at 4. Lucy Monistere, a WDI sales assistant, avers that WDI offers "Who Dat? Brand products, including apparel" for sale "through various retail location(s)." Rec. Doc. 207-13, at 1. The movants cannot prove that WDI has not used the marks merely by making a contrary assertion.

WDYC essentially argues that where it intends to sell coffee, donuts, and sandwiches at its coffee shop, WDI cannot possibly

prevail in proving a likelihood of consumer confusion.  WDI states

that it asserts that the name "Who Dat Yat Chat" would likely cause

confusion with WDI's "Who Dat Blues Band" mark.  The market for a

blues band, in the abstract, has little to do with the market for

coffee shop goods and services.  A trademark holder "may not enjoin

others from using the mark if the likelihood of confusion between

his product and the infringer's is minimal or non-existent, such as

where the parties to the action use the mark in totally different

markets, or for different products."  <u>Union Nat. Bank of Texas,

Laredo, Tex.</u>, 909 F.2d at 843.  However, WDI avers that it has a

pending PTO application for "Who Dat" in connection with, among

other things, bar and restaurant services.  There is insufficient

evidence submitted in connection with the instant summary judgment

motions regarding the actual scope of WDI's products and services

for the Court to state that WDI's counterclaim against WDYC fails

as a matter of law.

Of course, to prove it has a protectable mark, WDI must also

prove that its mark is distinctive.  The paradigm for addressing

trademark strength is a categorization into one of four categories,

listed from weakest to strongest:  (1) generic, (2) descriptive,

(3) suggestive, or (4) arbitrary or fanciful.  <u>Id.</u> at 844.  This

categorization bears upon whether or not a phrase is protectable.

Generic terms are not protectable.  Descriptive terms may only be

protected upon proof of secondary meaning.  Suggestive, arbitrary,

or fanciful terms are protectable without proof of secondary meaning. Id. The marks at issue do not appear to be generic or descriptive. A generic mark identifies a class of things or services, of which the particular item is a member. Id. at 845. "Who Dat" does not identify a class of things or services. A descriptive mark identifies a characteristic or quality of the article or service that bears the trademark. Id. "Who Dat" does not describe a characteristic or quality of coffee shops, restaurants, or types of apparel. In any case, categorization of mark strength is a factual issue. Xtreme Lashes, LLC v. Xtended Beauty, Inc., 576 F.3d 221, 227 (5th Cir. 2009). Storyville and Fleurty Girl do not carry their summary judgment burden of proving that WDI's putative marks are not distinctive as a matter of law.

WDYC incorrectly argues that WDI is collaterally estopped from pursuing its claims against WDYC in the instant case. The prior litigation in state court led to a judgment in November 1983 dissolving a temporary restraining order and denying both parties' requests for a preliminary injunction. Rec. Doc. 166-11. The judgment dismissing the case indicated that both parties—WDI and a clothing retailer—could pursue damages in a trial on the merits. Id. WDI avers that this never happened because the retailer, Tee's Unlimited, entered into a licensing agreement with WDI. See Rec. Doc. 205-4 (licensing agreement between WDI and Tee's Unlimited). There was no final judgment that precludes WDI's counterclaims

against WDYC in the present matter.

The Court does not decide that WDI has a protectable trademark. It only decides that the movants have not carried their summary judgment burden of demonstrating the absence of a genuine issue of any material fact regarding whether or not WDI has a protectable mark or marks in the phrase "Who Dat."

**2. Defenses**

Even where a plaintiff has a federally registered mark, alleged infringers such as the movants in this action may raise a "legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a). Thus, if the movants properly prove no genuine issue of material fact concerning the applicability of a defense, the federal trademark infringement claims must be dismissed.

**a. Abandonment**

It is a complete defense that the registrant of a mark has abandoned the mark. 15 U.S.C. § 1115(b)(2). Trademark abandonment occurs through the owner's nonuse and intent not to resume use.[7]

---

[7] See 15 U.S.C. § 1127. Under the Lanham Act, abandonment with respect to a trademark can occur in one of two ways:

**(1)** When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

**(2)** When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with

Storyville argues that public documentation showing the prosecution history of WDI's Who Dat mark in the context of clothing makes a prima facie showing of abandonment.

PTO records for WDI's mark, serial number 74459278, shows that the mark's class status is "Abandoned."[8] The class of goods is described as "clothing; namely, T-shirts, sweatshirts, scarves, hats, jackets, sport shirts, sport coats, and sport pants." The mark is described as "WHO DAT?", and the current status reads, "Abandoned because no Statement of Use or Extension Request timely filed after Notice of Allowance was issued." The last applicant of record shown is "Who Dat?, Inc," incorporated in Louisiana. The basis for the application is listed as "1(b)," which appears to correspond to Lanham Act, § 1(b). <u>See</u> 15 U.S.C. § 1051(b); <u>Rosenruist-Gestao E Servicos LDA v. Virgin Enter. Ltd.</u>, 511 F.3d 437, 439 (4th Cir. 2007), <u>cert. denied</u>, 553 U.S. 1065 (2008) (stating that Section 1(b) of the Lanham Act concerns intent-to-use applications and implying that it corresponds with 15 U.S.C. § 1051(b)). The prosecution history reveals that the statement of

---

which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

<u>Id.</u> The second way, concerning genericide, has already been discussed. The Court here focuses on the first way of proving abandonment.

[8] This documentation has been filed into the record at Record Document No. 184-3, at 53-55, also available at http://tarr.uspto.gov/servlet/tarr?regser=serial&entry=74459278. This information is publicly available on the PTO's website, specifically its Trademark Applications and Registrations Retrieval ("TARR") system.

use was filed on November 15, 1993, the mark was approved for publication on the Principal Register on March 31, 1994, and the application was abandoned on April 19, 1995 due to the applicant's failure to file a use statement.

Apparently, this particular mark was not the first Who Dat mark for clothing for which WDI filed an application that was subsequently listed in PTO records as abandoned. WDI points out the existence of this registration in its opposition memorandum for the proposition that the application was approved for registration without any demonstration of secondary meaning. Rec. Doc. 207, at 16. However, the exhibit it references, a printout of a search of PTO records, shows that the mark, serial number 74218866, is listed not as registered on June 2, 1992, but as published for opposition on that date. Rec. Doc. 207-9. A search for serial number 74218866 in TARR reveals that this mark's current status is "Abandoned because no Statement of Use or Extension Request [was] timely filed after [the] Notice of Allowance was issued."[9] The mark is listed as "WHO DAT?", the applicant as "Who Dat?, Inc.," incorporated in Louisiana, and the class as "clothing; namely, T-shirts, sweatshirts, scarfs, hats, jackets, pants, shirts, shorts, visors, headbands and socks." The application was filed on November 4, 1991, and the mark was approved for publication on the

_____

[9] Available online at
http://tarr.uspto.gov/tarr?regser=serial&entry=74218866.

26

Principal Register on January 28, 1992. As of February 26, 1993, the application's status was described as "Abandonment - No use statement filed." The basis for this filing was also "1(b)." Therefore, PTO records show that for at least these two WDI Who Dat marks for clothing, serial numbers 74459278 and 74218866,[10] the application status is listed as "abandoned" due to WDI's failure to follow up its intent-to-use applications with statements of actual use.[11] The issue, then, is the effect of the abandonment status of these applications upon whether or not WDI has abandoned any trademarks it may have had.

WDI's abandonment of its trademark applications may be evidence of whether it intended to abandon the marks. On the other hand, if the failure to complete the registration was inadvertent, abandonment of the *applications* may not prove abandonment of the *trademarks*. See <u>Crash Dummy Movie, LLC v. Mattel, Inc.</u>, 601 F.3d 1387, 1391 (Fed. Cir. 2010) (stating that although a party allowed its trademark registrations to lapse, "cancellation of a trademark

---

[10] Steve Monistere's affidavit states that for both of these trademarks, "intent to use" applications were filed. Rec. Doc. 207-1, at 5.

[11] Actual use of a mark in commerce is not a prerequisite under the Lanham Act to applying for registration of the mark. An applicant with a bona fide intention to use a trademark in commerce may request registration of its trademark on the principal register, 15 U.S.C. § 1051(b)(1), but the mark may not be registered until the applicant meets other requirements, <u>id.</u> § 1051(b)(3). The main additional requirement is for the applicant to file a statement of use within six months of issuance of a notice of allowance. <u>Id.</u> § 1051(d)(1). Only after this verified statement of use is filed may the mark be registered. <u>Id.</u> The failure to timely file the statement of use "shall result in abandonment of the application" unless the applicant shows that the delay in responding was unintentional. <u>Id.</u> § 1051(d)(4).

registration does not necessarily establish [a] lack of intent to use the mark"). Additionally, abandonment of the trademark applications is not evidence that WDI has not continued to use the marks.

Pretermitting the issue of intent,[12] the Court finds that there is sufficient evidence of use for WDI to survive summary judgment on the movants' abandonment defense. For the purpose of defining abandonment, "use" means the "*bona fide use* of [a] mark made in the *ordinary course of trade*." 15 U.S.C. § 1127 (emphasis added). The terms "bona fide use" and "ordinary course of trade" are conjunctively used in the same statute to define the term "use in commerce."[13] Thus, "use" for abandonment purposes is equivalent to "use in commerce" under the statute. <u>See</u> 15 U.S.C. § 1127. The statute goes on to provide that, for purposes of the particular chapter, a mark is deemed to be in use in commerce on goods when the mark is affixed to the goods and the goods are sold or transported in commerce. <u>Id.</u> WDI has submitted affidavits that, for summary judgment purposes, establish both the affixment of the phrase "Who Dat" to and the sale of clothing items from the late

---

[12] Because the Court ultimately concludes that WDI makes a prima facie showing of use, it need not reach the second abandonment prong of intent not to resume use.

[13] <u>See</u> 15 U.S.C. § 1127 ("The term '**use in commerce**' means the *bona fide use* of a mark in the *ordinary course of trade* . . . .") (emphasis added).

1980s until recently.[14]

Steve Monistere avers in his affidavit that, as president of WDI, he has personal knowledge that WDI consistently and continuously used Who Dat marks from 1983 until the present by "distributing, selling, manufacturing, licensing, and offering products, goods, services, entertainment, music cd's, records, and albums, food and merchandise under those trademarks." Rec. Doc. 207-1, at 6. He avers that this was the case even during the "lean years when 'WHO DAT' merchandise was not selling well" and that WDI "has never abandoned or intended to abandon its use of these marks." Id. A similar declaration was made via affidavit by Sal Monistere (Rec. Doc. 207-12, at 5). Lucy Monistere avers, "At all times from January 1, 1988 through mid June of 2002, Lucy and Dominic Monistere have offered for sale" WDI-branded merchandise. Rec. Doc. 207-13, at 1. WDI sales representative John Mayeaux makes a similar averment. Rec. Doc. 207-15, at 1.

The record also contains the affidavits of several retailers that have paid for licenses with WDI to use the phrase "Who Dat" on their merchandise. They aver that they sold Who Dat-branded merchandise pursuant to these licensing agreements during the

---

[14] Storyville objects to the admissibility of some of these affidavits on the grounds that the witnesses were not timely identified on WDI's witness list. Rec. Doc. 215, at 3 (citing Rec. Doc. 179, which does not list Frank Fortunato, John Mayeaux, Warren Hildebrand, or Pam Randazza as witnesses for WDI). In referring to these documents, the Court does not indicate that they would, in fact, be admissible at trial, but only that they are important evidence concerning the factual issues surrounding any abandonment defense.

alleged period of abandonment. <u>See</u> Rec. Doc. 207-14 (Frank Fortunato, owner of The She Shop, which sold Who Dat merchandise from January 1, 1988 through June 1, 1997); Rec. Doc. 207-16 (Warren Hildebrand, owner of Mardi Gras Records, which sold Who Dat merchandise "[a]t all times since January 1, 1988"); Rec. Doc. 207-18, at 2 (Pam Randazza, owner of the Black & Gold Shop, which purchased Who Dat t-shirts from WDI and which, "[s]ince 1992," has continuously bought Who Dat merchandise from WDI or its licensees). In sales representative Gina Monistere's affidavit, she avers that in November 2009, while making sales calls in the New Orleans French Quarter, she asked the manager of a t-shirt shop if the store sold Who Dat shirts, to which the manager replied she had some of "the old style from the 90's," offered a t-shirt from a rack containing the "original" Who Dat logo, and stated that she sold "a few every once in a while." Rec. Doc. 207-17.

Notwithstanding these affidavits, Storyville presses its abandonment argument premised on a distinction between the sale of merchandise bearing a trademark and the use of a trademark. It argues that even if WDI tried to sell Who Dat merchandise, WDI does not present any evidence of an attempt to maintain exclusive trademark use from 1994 when WDI failed to file a statement of use through late 2009 when WDI became proactive during the Saints' winning football season. However, Storyville cannot prevail on summary judgment because of WDI's evidence, which Storyville does

30

not rebut with its own evidence, that WDI attempted to maintain any goodwill it had in the marks through continuing to enter into licensing agreements and to sell goods bearing the marks.[15]

### b. Functionality

"That the mark is functional" is a defense to an infringement suit. 15 U.S.C. § 1115(b)(8). The statute does little to define the functionality defense, which has accumulated substantial judicial gloss. Under the traditional test, a mark is functional and therefore incapable of trademark protection "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 850 n.10 (1982). The rationale underlying the denial of trademark protection to useful product features is trademark law's goal of promoting legitimate competition by disallowing monopolies over useful product features that could continue indefinitely because of the potentially endless protection afforded to trademark owners. Qualitex Co. v. Jacobson Products Co., Inc., 514 U.S. 159, 164-65 (1995). Therefore, for example, the "special illumination-enhancing shape of a new patented light bulb," even if identifying a particular manufacturer as the product's source, would not receive trademark protection if this would frustrate

---

[15] Although Storyville also points out that WDI allowed a state trademark registration to expire in 1993, this is not conclusive of intent to abandon. Additionally, even to the extent the Saints registered Who Dat marks during the subsequent years, this is not conclusive proof that WDI stopped using its marks or intended to abandon them.

"competitors' legitimate efforts to produce an equivalent illumination-enhancing bulb." Id. at 165. Even if the light bulb shape identifies a particular manufacturer as the source, if that shape is deemed "functional," it is not a protectable trademark. In a case involving product design, the touchstone of functionality is whether trademark protection would significantly hinder competition by others. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 17, cmt. a (1995).

"Who Dat" on a t-shirt may be an element of product design in some sense. If it is fancifully inscribed on the shirt or displayed along with related items of local culture, it certainly could constitute artistic expression that is in some sense independent of any tendency to suggest that the garment originated with a company that sells wares bearing that particular phrase. However, this does not necessarily mean that any design element in "Who Dat" would be "useful" enough to be "functional." Under the traditional formulation, the phrase would not be functional because it is not essential to the use or purpose of the garment. The garment's central purpose of covering the wearer is preserved regardless of whether there is text on the garment. Although in some sense a popular phrase like "Who Dat" would affect the "quality" of the article, it has no effect on the ability of the garment to serve its primary clothing function.

However, under the more broadly stated "competitive necessity"

formulation, "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 32 (2001). The exclusive use by WDI of "Who Dat" on apparel arguably would put Storyville and Fleurty Girl at a disadvantage not related to reputation because they would be unable to tap into the segment of the market for Who Dat apparel that wants clothing bearing the phrase irrespective of sponsorship or brand affiliation. However, whether this non-reputation aspect would be "significant" under the TrafFix formulation is more difficult, although there is a potential answer in the doctrine of "aesthetic functionality."

The doctrine of aesthetic functionality acknowledges that when "aesthetic considerations play an important role in the purchasing decisions of prospective consumers," a design feature of a product that substantially contributes to the aesthetic appeal of the product may not be trademarkable. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 17, cmt. c (1995). The doctrine is an application or extension of the basic functionality premise: if a design confers a significant benefit upon consumers that cannot practically be duplicated by alternative designs, it is aesthetically functional. Id. However, because beauty is in the eye of the beholder, it is difficult to evaluate a given design's aesthetic superiority over alternative designs. Thus, a finding of aesthetic functionality

33

ordinarily requires objective evidence of a lack of adequate alternative designs. <u>Id.</u>

To the extent it is a viable theory, aesthetic functionality arguably would apply in a case like the present, as Storyville argues it does. Although the movants have not introduced concrete evidence in the form of consumer surveys or otherwise, it makes sense that consumers who purchase clothing labeled with the phrase "Who Dat" would give no great attention to the manufacturer or brand name, but would care greatly that the shirt reads, "Who Dat." It appears highly probable in light of the phrase's popular history in local New Orleans culture that consumers want Who Dat gear because it says "Who Dat"—perhaps combined with some other design element that the consumer wishes to identify with, such as a token of New Orleans culture, the Saints football team, or even indignation regarding the controversy raised by the instant case.[16] Such a set of facts may sit well under the functionality rubric. "Who Dat" on a t-shirt is a necessary design component of apparel sold in the New Orleans market—so the argument would go. Any significance of that phrase to indicate the source of the underlying good may pale in comparison with that design element's value in offering consumers the opportunity to identify with an

---

[16] <u>See</u> Rec. Doc. 194-2, at 3 (news item concerning Senator David Vitter's letter to the NFL stating that he would have t-shirts printed that read, "WHO DAT say we can't print Who Dat!").

idea or movement with which they wish to associate.[17]

The Supreme Court's approval *vel non* of the aesthetic functionality doctrine has been unclear. In <u>TrafFix</u>, the Supreme Court initially seemed to indicate that in the context of a claim for "trade dress" infringement, a product feature is not functional if it is "merely . . . ornamental." 532 U.S. at 30. However, the Court proceeded to state, "It is proper to inquire into a 'significant non-reputation-related disadvantage' in cases of *esthetic functionality*." <u>Id.</u> at 33 (emphasis added). The Fifth Circuit has apparently rejected the invitation to acknowledge aesthetic functionality as a defense.

In <u>Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.</u>, 510 F.2d 1004 (5th Cir. 1975), <u>cert. denied</u>, 423 U.S. 868 (1975), the Fifth Circuit held that the unauthorized manufacture and sale of emblems for attachment to clothing bearing professional hockey team symbols violated the teams' trademark rights in those symbols. After holding that the defendant's sale of the emblems violated the hockey teams'

---

[17] There is support for such an analysis of the functionality defense in the context of purchases driven by consumers' desire to associate with expressions that may serve as trademarks. <u>See</u> Gerald T. Tschura, <u>Likelihood of Confusion and Expressive Functionality: A Fresh Look at the Ornamental Use of Institutional Colors, Names and Emblems on Apparel and Other Goods</u>, 53 Wayne L. Rev. 873 (2007). Tschura takes the view that especially in the context of sports-branded apparel, "the expression of the wearer's allegiance [to the team described by the trademark] is the essential function." <u>Id.</u> at 874. He argues that in the context of clothing with sports team names, such putative trademarks serve a small source-identification function that is outweighed by the "expressive or communicative function of the ornamentation." <u>Id.</u> at 893-94.

trademark rights, the court rejected the defendant's argument that the marks on the apparel were functional. The court stated that the embroidered symbols were not sold because of any aesthetic characteristic but because they were the trademarks of hockey teams. Id. at 1013.

The Fifth Circuit revisited the aesthetic functionality doctrine in detail more than three decades later in Board of Supervisors for Louisiana State University Agricultural and Mechanical College v. Smack Apparel Co., 550 F.3d 465 (5th Cir. 2008), cert. denied, 129 S. Ct. 2759 (2009). The Fifth Circuit in Smack Apparel determined that in the context of certain images, the school colors of the plaintiff universities were trademarkable, and under the facts presented, the defendant's manufacture and sale of shirts bearing those university colors created a likelihood of consumer confusion. With respect to functionality, the court stated that fans and other members of the public purchased the shirts only because they contained the team colors and indicia—a purpose that the court found only to indicate trademark functions. Id. at 486. The court stated that the marks were not functional under the traditional test: they did not make the t-shirts "work." Id.

The court then addressed the defendant t-shirt manufacturer's non-traditional functionality argument that "the shirts allow groups of people to bond and show support for a philosophy or goal;

facilitate the expression of loyalty to the school and a determination of the loyalties of others; and identify the wearer as a fan and indicate the team the fan is supporting." Id. at 486-87. The court then stated that these uses were of the same sort as those in Boston Hockey and stated, "Our circuit has consistently rejected the concept of aesthetic functionality." Id. at 487.[18] As previously noted, the Supreme Court in TrafFix appeared to have left open the possibility that aesthetic functionality is a viable doctrine. The Fifth Circuit in Smack Apparel declined to walk through that opening: "We do not believe that the Court's dictum in TrafFix requires us to abandon our long-settled view rejecting recognition of aesthetic functionality." Id. at 487-88. Fans wanted the t-shirts at issue because they bore the universities' marks; therefore, the marks were not functional. Id. at 488.

The Fifth Circuit's decision in Smack Apparel leaves no room for this Court to countenance Storyville's functionality argument. To the extent "Who Dat" can be shown to be a trademark placed upon t-shirts, the t-shirt purchaser's demand is for that mark itself rather than any non-aesthetic function it could provide to the wearer. The Smack Apparel court specifically rejected the argument that a purchaser's desire to show support for a certain philosophy

---

[18] For this proposition, the court cited footnotes in two prior cases, one of which actually declined to decide "the viability of aesthetic functionality in this circuit," after initially stating that the "circuit has rejected the doctrine of aesthetic functionality." Smack Apparel, 550 F.3d at 487 n.100 (citing Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 540 (5th Cir. 1998)).

37

or goal can render the sought-after mark functional.  The only cognizable way to distinguish <u>Smack Apparel</u> is that the marks in that case were intended to directly refer to their owner. Arguably, in the present case, the variety of Who Dat shirts and other clothing items sold by Storyville and Fleurty Girl demonstrates that the marks would not necessarily have WDI as their sole reference.  From this proposition, one could argue that "Who Dat" is uniquely functional because it puts WDI's competitors at a non-trademark disadvantage not to be able to tap the demand for clothing bearing a phrase that could refer from anything to the Saints football team to old-time minstrel shows.  There is legal scholarship that supports such a result on the pragmatic grounds that a mark like Who Dat *is* the product—and without any sponsorship implication, affording trademark protection would afford a monopoly over a product.[19]  However, this court is bound by precedent suggesting that a consumer's desire to express his identity with a mark does not make it functional.  "Who Dat" does not make a t-shirt work better.  Therefore, it is not functional.

## C.  State Trademark Infringement Claims

Although WDI relies on its alleged federal trademark rights to defend against the instant motions, the movants do argue that the state law claims should be dismissed.  The movants do not carry their summary judgment burden, largely for the reasons previously

---

[19] <u>See</u> Tschura, *supra* note 17, at 893.

discussed in the context of the federal infringement claims. WDYC argues that the Louisiana trademark registrations should be canceled because they were obtained fraudulently. See LA. REV. STAT. § 51:219(4)(d) (stating that "[t]he secretary of state shall cancel from the register . . . [a]ny registration concerning which a court of competent jurisdiction shall find . . . [t]hat the registration was obtained fraudulently"). WDYC asserts that WDI's Louisiana trademark application states that the mark "Who Dat" was first used anywhere on October 14, 1983. WDYC argues that this statement was untrue and resulted in a fraudulent trademark registration.

WDYC's argument is not persuasive. That the public used the phrase "Who Dat" prior to October 14, 1983 does not make WDYC's application fraudulent. WDYC asserts that WDI asserted that the *mark* was first used anywhere on that date—that it was first used *as a trademark* on that date. There is no proof that such a statement would be untrue, for none of the movants argues that some other entity used "Who Dat" as a trademark prior to WDI.

Fleurty Girl argues that the state trademark claim should be dismissed because WDI's only use of the trademark has involved licensing agreements. It cites WDI's complaint that discusses WDI's licensing agreements in the early 1980s, around the time that WDI applied for state trademark protection. See Rec. Doc. 41, at 10-11, ¶¶ 35-36. WDI submitted Steve Monistere's affidavit that he sold Who Dat items in 1988 at Saints games. Rec. Doc. 207-1, at 4-

5. In light of this factual issue regarding whether WDI did more than merely license its putative trademark rights, the state law claim should not be dismissed on summary judgment. This is true notwithstanding Fleurty Girl's submission of evidence that the Louisiana trademarks are listed as "expired," because registration of a mark confers only procedural rights. <u>Givens Jewelers, Inc. v. Givens</u>, 380 So. 2d 1227, 1231 (La. App. 2d Cir. 1980). That WDI may no longer have a state registration does not mean it does not have an infringement claim.

## D. Dilution Claims

Concerning the federal dilution claim, Storyville argues that WDI cannot meet the very high standard of proving the WDI marks' fame. Storyville argues that WDI's sales are negligible and its advertising non-existent. However, Storyville introduces no evidence to support these assertions. Instead, it points out that WDI bears the burden of proving that "Who Dat" is a famous mark in connection with WDI's goods and argues that WDI has not done so and cannot do so.

First, the Louisiana anti-dilution statute does not require a showing of the mark's fame. <u>Advantage Rent-A-Car, Inc. v. Enterprise Rent-A-Car, Co.</u>, 238 F.3d 378, 381 (5th Cir. 2001); <u>see also</u> La. Rev. Stat. § 51:223.1 (not stating any requirement of fame). Second, regarding the federal dilution claim, the Lanham Act states that "a mark is famous if it is widely recognized by the general

consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). While questionable whether the general consuming public would recognize that "Who Dat" is a source indicator for any goods or services emanating from WDI, the fame inquiry is a factual one.[20]

Because WDI would bear the burden of proof at trial regarding the federal dilution claim, Storyville may satisfy its burden by merely pointing out that the record evidence is insufficient with respect to the element of fame. See Celotex, 477 U.S. at 325. Even assuming Storyville has done so, such that the burden shifts to WDI, WDI sets out specific facts showing that a genuine issue exists. See id. at 324. There are allegations by WDI that there were sales to the "general public." See Rec. Doc. 207-15, at 1 (affidavit of John Mayeaux); Rec. Doc. 207-17 (affidavit of Gina Monistere). Further, the parties have submitted hardly any

---

[20] See 15 U.S.C. § 1125(c)(2)(A). The Lanham Act provides a list of nonexclusive factors for consideration:

(I) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Id.

evidence bearing on the fame factors, namely, the extent of advertising, the volume of sales, and the extent of public recognition of WDI's putative marks. The record is not sufficiently developed for the Court to rule as a matter of law on the federal dilution claim.

**E.  Remaining Causes of Action**

Many of the counts in WDI's third amended complaint appear not to apply to the movants, but were intended to apply to the NFL and the Saints, who are no longer in the litigation. Thus, Storyville argues that each of the 13 counts should be dismissed. WDI concedes that the causes of action for cancellation (Count 2), fraudulent registration (Count 3), breach of contract (Count 5), and fraud (Count 13) only applied to the claims against the NFL and the Saints. Thus, those claims should be dismissed.

Storyville requests the dismissal of all other counts: Count 1 for declaratory relief, Count 4 for a permanent injunction, Count 6 for deceptive advertising under state law, Count 7 for federal trademark infringement, Count 8 for state law statutory trademark infringement and dilution, Count 9 for unfair competition, Count 10 for federal dilution, Count 11 for federal commercial and product disparagement, and Count 12 for negligence. The Court declines to dismiss these counts because of factual issues, as previously discussed. However, the Court already dismissed Counts 11 and 12 as to the Saints and the NFL (Rec. Doc. 64). WDI is ordered to

amend its complaint to remove allegations regarding claims against parties that have been dismissed and to clarify the causes of action it presses forward. <u>See</u> Rec. Doc. 242-3, at 6 (WDI acknowledging that the NFL settlement changed the nature of the litigation and that the parties have not amended pleadings to narrow the issues still before the Court).

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the motions for summary judgment filed by Who Dat Yat Chat, LLC (Rec. Doc. 166), Storyville Apparel LLC (Rec. Doc. 184), and Fleurty Girl, LLC (Rec. Doc. 194) are **DENIED IN PART,** as set forth above.

**IT IS FURTHER ORDERED** that the causes of action in Who Dat, Inc.'s third amended complaint for cancellation (Count 2), fraudulent registration (Count 3), breach of contract (Count 5), and fraud (Count 13) are **DISMISSED AS MOOT.**

**IT IS FURTHER ORDERED** that Who Dat, Inc. is ordered to amend its complaint to remove allegations regarding claims against parties that have been dismissed and to clarify the causes of action it presses forward.

New Orleans, Louisiana, this 3rd day of April, 2012.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE